MRS ELIZABETH STANTON *et al. v.* T. L. HERBERT & SONS
*et al.*

(*Nashville.* December Term, 1918.)

1. **DEEDS.** Exception. Reservation. Distinguished.

A clause that the conveyance is subject to a right of the grantors
to remove sand from the land is not an exception with respect
to part of the thing granted, but a reservation to the grantors: such
right not formerly existing separately, but having been called
into being by the deed. (*Post, pp.* 443, 444.)

2. **EASEMENTS.** Reservations. Incorporeal hereditament.

A reservation of the right to remove sand in a deed as "an ease-
ment, right or privilege," with rights necessary for such use,
does not create an exclusive right passing an interest in land,
corporeal, assignable, and divisible, but an incorporeal heredita-
ment, assignable but not divisible. (*Post, pp.* 444-448.)

Cases cited and approved: Earl of Huntington v. Lord Mountjoy,
4 Leo., 147; Doe v. Wood, 2 Barn. & Ald., 724; Gloninger v. Frank-
lin Coal Co., 55 Pa., 9; Johnstown Iron Co. v. Cambria Iron Co.,
32 Pa., 241; Caldwell v. Fulton, 31 Pa., 475; Massot v. Moses, 3 S. C.,
168; Post v. Pearsall, 22 Wend. (N. Y.), 425; Boatman v. Lasley,
23 Ohio St., 614; Hinicum Fishing Co. v. Carter, 61 Pa., 21.

Cases cited and distinguished: Cheatham v. Williams, 4 East., 469;
Duke of Sutherland v. Heathcote, 1 Ch., 475.

3. **EASEMENTS.** Assignment. Right to take sand. Construction and
operation.

Where grantors assigned an assignable but indivisible right to take
sand in the deed to three contractors building a large plant and
using more sand than grantors would, such attempted division
destroyed the reservation and gave the contractors no right to
take sand. (*Post. pp.* 448-453.)

Cases cited and approved: Buerton's Case, 6 Co., 1; Turringham's

Case, 4 Co., 37; Leyman v. Abeel, 16 Johns., 30; Chandler v. Hart, 161 Cal., 405.

Cases cited and distinguished: Van Renselaer v. Radcliff, 10 Wend. (N. Y.), 639; Luttvel's Case, 4 Co., 87.

4. **NAVIGABLE WATERS. Islands. Ownership. Taking sand. Damages.**

The owner of an island in a navigable river cannot recover for the value of sand wrongfully taken from land submerged by the construction of a government dam; such land being government property, taken by eminent domain, for which the government was liable in damages. (*Post, pp.* 453-455.)

Acts cited and construed: Acts 1899, ch. 425, sec. 10.

Cases cited and approved: Reelfoot Lake Case, 127 Tenn., 575; United States v. Lynah, 188 U. S., 445; United States v. Great Falls Mfg. Co., 112 U. S., 645.

---

FROM DAVIDSON.

---

Appeal from the Chancery Court of Davidson County. Hon. Jas. B. Neman, Chancellor.

Joseph R. West and Jordan Stokes, Jr., for appellants.

Thos. H. Malone, C. C. Trabue and Manier & Crouch, for appellees.

Mr. Justice Green delivered the opinion of the Court.

The bill in this case was filed by the complainants to enjoin the defendants from removing sand and gravel from Hill's Island in the Cumberland river, about twenty miles above Nashville, and to recover damages.

This island is the property of the complainants, and the defendants are building contractors at Nashville and were removing sand and gravel from said island and the water adjacent thereto for use in contracts which they had for the erection of buildings at the powder plant.

A demurrer coupled with an answer was filed by the defendants. The chancellor sustained the demurrer and dismissed the bill, and the complainants have appealed to this court.

Hill's Island was formerly the property of Mrs. Mary Nolan and William E. Jordan. On June 12, 1911, they conveyed to complainants, Mrs. Elizabeth Stanton and Rush Hawes. Said deed described the property and was in the usual form of a warranty deed, except that in the *habendum* clause there were these words:

"Subject, however, to an easement, right, or privilege, to remove sand from said property for a period of ten years from the date of this conveyance, and such rights, privileges, and easements as may be necessary and proper for such use which easements, privileges, and rights are hereby retained by the grantors herein."

It was averred in the bill that the grantors had attempted to assign their right to remove sand from said island to their codefendants, W. T. Hardison & Son, T. L. Herbert & Sons, and the Nashville Builders' Supply Company, and that the said codefendants, along with Jordan, were removing tremendous quantities of sand and gravel from said island and the water adjacent thereto, for use in their powder plant contracts as aforesaid, and that they were very seriously damaging the complainant's property. It was alleged that these

codefendants were acting illegally in the premises, since the complainants were advised that the reservation or exception of the right to remove sand contained in said deed was void for uncertainty, and for that it was contradictory to and destructive of the grant, and that, at any rate, the right of the original grantor to remove sand was personal and not assignable nor divisible.

All these propositions of law were challenged by the demurrer, and the allegations of fact contained in the bill were rather generally denied by the answer.

As is apparent from the foregoing statement, numerous questions are raised in this case, and they have been debated with much learning and ability. It will not be necessary to consider them all. A determination of the nature of the right or interest reserved in this property by the original grantors simplifies the solution of the case.

Although it is perhaps not a matter of great importance, we may observe that we think the right of the grantors to remove sand from this island arose under their deed by way of reservation and not by way of exception.

"A reservation is a clause in a deed, whereby the grantor reserves some new thing to himself, issuing out of the thing granted, and not *in esse* before; but an exception is always of a part of the thing granted, or out of the general words and description in the grant." 4 Kent. Com., star page 468.

The rule that a reservation must be something not *in esse* is not to be understood as preventing the reservation of some right which the grantor previously

enjoyed. The right reserved may have previously existed as an incident of the title to the land. To be the subject of a reservation, such a right need only be separated from the ownership of the land. Thus separated, as an independent right, it is new. It did not formerly exist separately, but was called into being by the reservation in the deed. 8. R. C. L., p. 1091.

We think the right to remove sand reserved to the grantors under this deed was not exclusive. There is nothing in the language used in the deed to indicate that such right was intended to be exclusive. The right was described ''as an easement, right, or privilege.'' The indefinite article ''an'' was used, not ''the.'' In addition to the right to remove sand, only such other rights and privileges were reserved as were necessary to effectuate the principal right. There is nothing to show an intention to deprive Stanton and Hawes of the right to remove sand themselves. Under the authorities, the presumption is against an exclusive grant or reservation of this nature.

The first case dealing with the question involved here was that of *Earl of Huntington* v. *Lord Mountjoy,* 4 Leo., 147; 1 And., 307; and Godb., 18.

This case has been variously reported, and not always to the same effect; but the case has always been understood to have declared that a mere grant of liberty to dig coals did not confer on the grantees an exclusive right to dig them.

In *Chetham* v. *Williams,* 4 East., 469, Lord ELLENBOROUGH said: ''No case can be named where one who has only a liberty of digging for coals in another's soil has an exclusive right to the coals, so as to enable

him to maintain trover against the owner of the estate for coals raised by him.''

In *Doe* v. *Wood*, 2 Barn. & Ald., 724, it was held that the grant by deed of liberty to search for, work, and dispose of minerals was in effect a license and did not operate as a grant of the minerals, nor did it entitle the licensees who were working certain mines to bring ejectment against persons working another mine within the area covered by the license. The right of the grantee in this case was described as a mere ''incorporeal privilege.''

In *Duke of Sutherland* v. *Heathcote* (1892), 1 Ch. 475, there was a reservation of a right to dig and carry away coal quite similar to the reservation of the right to dig sand, in the deed before us. Lord LINDLEY said of the grantors:

''They reserved a profit *a prendre,* an incorporeal hereditament, not a mere personal license. . . . A profit *a prendre* is a right to take something off another person's land; such a right does not prevent the owner from taking the same sort of thing from off his own land; the first right may limit, but does not exclude the second. An exclusive right to all the profit of a particular kind can no doubt be granted; but such a right cannot be inferred from the language when it is not clear and explicit.''

In *Gloninger* v. *Franklin Coal Co.,* 55 Pa., 9, 93 Am. Dec., 720, there was a deed granting ''the free right to dig coal at the coal bed under the foot of the mountain on my lot. No. 22, in third division of lands in Wilkes-Barre, with the privilege freely to carry the coal . . . to and from said coal bed through my land at all times

hereafter, doing as little damage as may be, in the uses aforesaid.'' It was held that the language used created an incorporeal hereditament and not an exclusive right to all the coal.

In *Johnstown Iron Co.* v. *Cambria Iron Co.,* 32 Pa. 241, 72 Am. Dec., 783, there was a grant of ''privilege of raising iron ore in his fields at twenty-five cents per ton, and also the privilege of raising the iron ore on his woodland, after his contract with McGill & Mc-Kiernan is filled, at the same price (twenty-five cents per ton), and to give the privilege to none else.'' It was held that such a right was not exclusive in the grantees, but was to be enjoyed in common with the grantor, his heirs and assigns.

It is obvious from these authorities that a mere grant of the right or privilege of removing minerals from the land of another does not in itself create an exclusive right or privilege in the grantees. Such cases are to be distinguished from those in which there is a grant of all the minerals in certain property or a grant of an exclusive right to remove the minerals.

The latter class of cases is illustrated by *Caldwell* v. *Fulton,* 31 Pa., 475, 72 Am. Dec., 760. The language used in the grant there considered was construed to mean that the grantee was entitled to take all the coal in the land. The deed was held to be a conveyance of the coal itself. It was said that coal and minerals in place are land, and that it was no longer to be doubted that they were subject to conveyance as land. The deed, therefore, was held to pass an interest in the land—a corporeal interest.

Likewise in the case of *Massot* v. *Moses*, 3 S. C., 168, 16 Am. Rep., 697 there was a conveyance held to pass all the phosphates on a particular tract of land, and it was declared that this created an exclusive interest in such minerals in the grantee. A part of the land itself was conveyed. This case of *Massot* v. *Moses* is a learned review of the authorities on this subject and a very clear statement of the established rules of law, although not so easy to follow in its application of the principles stated to the facts of the particular case.

The distinction between a conveyance of all the minerals in a particular tract of land, or an exclusive right to the minerals, and a deed granting a right to remove minerals from land by the grantee to be enjoyed in common with the grantor, appears in numerous cases collected in notes in 26 L. R. A. (N. S.), 614, and 18 L. R. A., 491. In many cases the land itself is denied, which, of course, confers an exclusive right to the minerals.

The effect of this distinction is this: If all the minerals are conveyed, or an exclusive right thereto, an interest in the land passes. This is a corporeal interest, which may be assigned, divided, or dealt with as any other interest in land. If, under the grant, there passes only a right to remove minerals in common with the grantor, an incorporeal hereditament results.

Such an incorporal hereditament is referred to in some of the cases as a license, and in some of them as an easement in gross. It is not, however, a revocable license, and it is not an easement that is personal to the grantee. It is a profit *a prendre*, and under the

weight of authority a profit *a prendre* is both inheritable and assignable. *Post* v. *Pearsall*, 22 Wend. (N. Y.), 425; *Boatman* v. *Lasley*, 23 Ohio St., 614; *Tinicum Fishing Co.* v. *Carter*, 61 Pa., 21, 100 Am. Dec., 597.

While a profit *a prendre* is assignable, it is not divisible. This rule is applicable, to mining cases and is recognized in *Caldwell* v. *Fulton*, supra, and in *Massot* v. *Moses*, supra, and applied in Lord Mountjoy's Case.

Such an incorporeal hereditament is similar in legal contemplation to commons of estovers or fishery. These were held to be indivisible, and, if an attempt to divide or apportion them was made, a destruction of the right resulted.

In the case before us, it appears that the grantors undertook to assign rights to remove sand from Hill's Island to W. T. Hardison & Son, T. L. Herbert & Sons, and Nashville Builders' Supply Co. In the answer filed by these defendants, they justify their removal of sand from the island on the ground that they are assignees of the reserved rights of the grantors in the deed to these complainants. It is not a fair construction of the pleadings to conclude that these defendants were users of a "common stock," as said in Lord Mountjoy's Case, or were engaged in any joint enterprise. They were separate contractors, and each had contracts with reference to the building of the powder plant. They claim as "assignees" of the grantors, not as "assignee."

In *Van Rensselaer* v. *Radcliff*, 10 Wend. (N. Y.), 639, 25 Am. Dec., 582, it was held that a common of estovers was not apportionable, and, if the tract to which

the common was appurtenant was conveyed to different persons, the common was extinguished.

The court in this case reviewed some English authorities, and compiled an interesting statement of the reasons for the rule preventing the division of incorporeal hereditaments of this nature. From this case we quote as follows:

"The authorities also inform us that common of estovers cannot be apportioned. Lord COKE says, 'If a man have reasonable estovers, as housebote, etc., appendant to his freehold, they are so entire that they shall not be divided between coparceners.' Co. Lit., 164, b; 3 Cru., 93. Lord Mountjoy's case is there stated, which was that of common of turbary, and it was resolved that he could not asign his interest to one or more, for that might work a prejudice and surcharge to the tenant of the land, and, therefore, if such an inheritance descended to parceners, it cannot be divided. In *Luttvel's Case*, 4 Co., 87, Lord COKE says: 'So, if a man has estovers by grant or prescription to his house, although he alters the rooms and chambers of this house, as to make a parlor where it was the hall, or the hall where the parlor was, and the like alterations of the qualities and not of the house itself, and without making new chimneys, by which no prejudice accrues to the owner of the wood, it is not any destruction of the prescription, for then many prescriptions would be destroyed; and although he builds a new chimney or makes a new addition to his old house, by that he shall not lose his prescription, but he cannot employ or spend any of his estovers in the new chimneys, or in the part newly added.' 3 Cru., 89. Estovers appurtenant to a

141 Tenn.—29

house cannot be separated frcm the house; but must be spent on the house. 3 Cru., 89; Plowd., 382. These authorities seem to be express that common of estovers cannot be apportioned, and for the reason that thereby the land out of which the estovers are to be taken would be surcharged. If, for instance, estovers are granted as belonging to a farm of two hundred acres, so long as this is one farm, there is but one house and probably not more than two chimneys; but if this farm is divided into two, another house becomes necessary, and double the number of chimneys must be supplied. This would be an injury to the lord. So also of fences and buildings; by dividing the farm into two, more fences and buildings become necessary, and if both are to be supplied from the woods of the lord, an increased quantity would be taken, where, by the grant itself, only estovers for one farm were allowed. As these estovers cannot be apportioned, neither of the tenants among whom the farm is divided can have them, and therefore they become extinguished. Common of estovers must be considered as an entire thing, not to be divided; and in case of a common person, if an entire thing be divided or extinguished in part by the act of the party, it is an extinguishment of the whole; but otherwise where it is by the act of God or the law. 11 Vin., 567, pl., 4, tit. Extinguishment, P; *Bruerton's Case,* 6 Co., 1; Turringham's Case, 4 Co., 37.

"Lord Coke also says, 'If a man have reasonable estovers, as housebote, heybote, etc., appendant to his freehold, they are so entire as they shall not be divided between coparceners.' Co. Lit., 164 b. In answer to the question, What shall become of such inheritances? he

says it appears by the books that the eldest shall have them, and the others a contribution; but if no other property descended from which contribution could be had, then the parceners should have alternate enjoyment, or, in case of piscary, one shall have the first fish and another the second; and so of a toll-dish, where the hereditament was the toll of a mill.''

A like result had previously been reached by the New York court in *Leyman* v. *Abeel,* 16 Johns., 30; ''and this,'' says Chancellor KENT, ''upon an old and just principle of law to prevent the land from being doubly or trebly charged. In accordance with the case of *Earl of Huntington* v. *Lord Mountjoy,* it was held that a common in gross and uncertain as the right to cut wood and dig turf, might be assigned, but it could not be aliened in such way as to give the entire right to several persons to be enjoyed by them separately.'' 3 Kent. Com., p. 408.

From the authorities discussed it is manifest that the grantors by the reservation contained in their deed only obtained a right in common with their grantees to remove sand from this island. Such a right was a mere incorporeal hereditament, and could not be divided as here undertaken. The attempted division has destroyed the reservation. The assignees of the grantors, therefore, were not entitled to this sand.

We cannot undertake a further review of the authorities cited by counsel. We are content to follow the courts of England and of Pennsylvania. These courts have largely developed the law relating to mines and mineral rights, in so far as the subject is not controlled by statute, and their decisions on this subject

are entitled.to the greatest consideration owing to the magnitude of such interests in these jurisdictions, to say nothing of the ability of the judges.

Indeed, there is little conflict of authority. Cases relied on by the defendants are, almost without exception, cases in which there was an exclusive right considered, and, as heretofore seen, such. a right is both assignable and divisible. It is an interest in the land.

The case of *Chandler* v. *Hart,* 161 Cal., 405, 119 Pac., 516, Ann. Cas., 1913B, 1094, is not in point. It was there held that a lease of oil rights might be divided. but there was a demise of the land itself with the exclusive right to take the oil. The court distinguishes the case from Lord Mountjoy's Case, and those following the earlier authority, on the ground that the grantee in the California case had the exclusive right to remove oil, and on· the other ground that the development of oil lands differs in character from the development of mines. *Chandler* v. *Hart* was properly decided on these facts, and we see nothing in the reasoning of the court that conflicts with what has been heretofore said. We do not understand this case as disapproving Lord Mountjoy's Case.

The justice of the rule against the apportionment or division of an incorporeal hereditament, such as this, is strikingly illustrated in the case before us. The complainants here might very well have agreed that their immediate grantors, one of whom was a contractor, should reserve enough sand for use in their own business. The grantors, however, undertook to assign this right to three of the largest contractors in Nashville, who were engaged in the building of the largest

plant in the United States—a plant demanded by the exigencies of the great war, and designed by the government to manufacture enough powder to supply the needs of the United States and all its Allies. To permit the grantor to apportion his right to sand among three such contractors engaged in such an enterprise would have required quantities of sand never dreamed of by the parties at the time this deed was made. It would, indeed, have been a surcharge of the land.

It follows that the Chancellor was in error in holding that complainants were not entitled to injunctive relief.

Coming to the question of damages, it will not be denied, in the light of the foregoing, that complainants are entitled to recover the value of the sand and gravel taken from the island above present low water mark.

The level of the water has, however, been raised on this island of recent years by the construction of a lock and dam by the government at a point in the river shortly below. So that a portion of the island is now submerged and in the channel of the river at low water, which at that stage of the river was formerly dry land and the property of these complainants.

Complainants insist that they did not lose title to their property thus covered by water and are entitled to recover for sand and gravel dredged from that portion of the island once above low water, but over which the river flows at all stages since the building of the dam. They rely on *Reelfoot Lake Case,* 127 Tenn., 575, 158 S. W., 746. Reelfoot Lake was formed by an earthquake. A large body of land sank below the level of the earth and was covered by water and a navigable lake was formed. Some of this land had

been granted by the state prior to the earthquake, and this court held that the title of the land was not affected by the formation of the lake.

We think the Reelfoot Lake Case is not in point here. The land there was merely submerged by an avulsion. In the case in hand there was a submergence and a taking of the land by the federal government in the exercise of the power of eminent domain for purposes of navigation. For this taking the government was liable in damages. *United States v. Lynah,* 188 U. S., 445, 23 Sup. Ct., 349, 47 L. Ed., 539; *United States v. Great Falls Mfg. Co.,* 112 U. S., 645, 5 Sup. Ct. 306 28 L. Ed., 846.

We think this taking was for a purpose inconsistent with the retention of title by the owners to the submerged sand and gravel as such. The raising of the level of the river here brought this sand and gravel into the channel of a navigable stream. Any excavation in such waters is forbidden by act of Congress (Act March 3, 1899, chapter 425, section 10, 30 Stat. L., 1151, Fed. Stat. Ann., vol. 6, p. 813 [U. S. Comp. St. section 9910]).

We are of opinion that complainants are not entitled to recover for the value of sand and gravel removed, which they themselves had no right to remove, but could only have gotten out by permission of the government authorities.

Other items of damages are claimed by the complainants, but these matters have not been fully presented, and perhaps could not be intelligently discussed until proof is taken. At all events, we are unwilling to

Stanton v. Herbert & Sons.

attempt a disposition of these questions unless the case be further developed.

The case will be remanded for further proceedings, not inconsistent with this opinion, with leave to complainants to set up and recover all damages to which they may be entitled under the proof and the law.

Defendants will pay the costs of this court. The costs below will be adjudged by the Chancellor.